UNITED STATES DISTRICT COURT                                          **C/M**
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------  X
                                                              :
NEAL JUNIOR BROWN,                                            :
                                                              :
                                Plaintiff,                    :     **MEMORANDUM**
                                                              :     **DECISION AND ORDER**
                        - against -                           :
                                                              :       17-cv-7566 (BMC)
COMMISSIONER OF SOCIAL SECURITY,                             :
                                                              :
                                Defendant.                    :
------------------------------------------------------------  X

**COGAN**, District Judge.

1.      Plaintiff *pro se* qualified for Supplemental Security Income benefits as a child

because of his disability.  When he turned 18, he had to be re-evaluated as an adult under Social

Security regulations.  After four aborted hearings, at which he either refused to appear, got into

arguments with the Administrative Law Judge or his mother, and didn't understand the questions

asked of him or the instructions given to him, the ALJ found that plaintiff had severe

impairments of a learning disability, speech and language delay, bipolar disorder, antisocial

personality disorder, and a marijuana use disorder.  Notwithstanding those impairments, the ALJ

found that plaintiff had sufficient functional capacity to work at any exertional level as long as he

was limited to simple, repetitive tasks in a routine work setting with few changes and had only

occasional interaction with the public, co-workers, and supervisors.

2.      Plaintiff seeks review of that decision under 42 U.S.C. § 1383(c)(3).  He has not

opposed the Commissioner's motion for judgment on the pleadings, but given his *pro se* status

(and obvious impairments), I have reviewed the record to discern the strongest arguments that he

could make.

3.     There are two related issues that I see on this record.  The first is whether the impairment in plaintiff's ability to interact with others rises to the level of "extreme" so that he meets the Listing of Impairments § 12.08, personality disorders (or, alternatively, whether he has "marked limitations" in both his ability to interact with others and his ability to manage himself, which would also meet Listing § 12.08).  The second issue is, if plaintiff's impairment in social functioning is not considered "extreme," it is sufficiently severe that, when coupled with his borderline to low intelligence and communication and concentration deficits, he lacks the sufficient residual functional capacity to work.  Starting with the first issue, the ALJ held that plaintiff has "moderate difficulties" with some "significant" limitations in social functioning and in his concentration, persistence, or pace, but that those limitations were neither "extreme" nor "marked."  That holding drove the ALJ's resolution of the second issue.

4.     Perhaps the most probative evidence on these issues is something which the ALJ had available but did not consider.  The transcripts of plaintiff's hearings clearly show that plaintiff had significant difficulty interacting with other people, following any instructions, expressing himself clearly, and understanding what other people (except maybe his mother) told him.  The four hearing transcripts may be far more probative of plaintiff's functional capacity than the single-shot consulting examinations and non-examining record reviews from years before the hearings upon which the ALJ principally relied.

5.     At the first attempted hearing in July 2015, when the ALJ asked plaintiff if he knew that he had the right to be represented, plaintiff disclaimed knowledge of any such right (despite the clear advice contained on the notice setting the hearing).  The following exchange then ensued:

ALJ:     You did not know that you could bring an attorney with you?

CLMT:     No, I did not.

ALJ:      Okay. Well, if you would like to have an attorney or representative, we have a list of attorneys or representatives that you can contact. We have some agencies that will represent you for free if you qualify under their income requirements. I am here to give you a full and fair hearing, however, I cannot be your attorney or your advisor. An attorney or advisor can do different things for you than I can do. They can advise you on the law, and they can present evidence and witnesses on your behalf. We also have a Vocational Expert here, today. I'm going to swear him in and ask him some questions after I've spoken to you and questioned you. He will then answer questions about any job history that you have, any jobs that you may have performed in the past, and any jobs that you might be able to perform now. This is an important legal matter for you, because I will decide whether or not you are going to receive Social Security Disability Benefits or Supplemental Security Income. If you want an attorney or representative, I'll give you a pre -- a brief postponement. Have you had any postponements before to get an attorney or representative?

CLMT:     What you mean by that?

ALJ:      Well, have you ever been here before?

CLMT:     Yeah, but seen the judge, no.

ALJ:      I'm sorry? Seen the judge, no?

CLMT:     Seen the judge, no.

ALJ:      Okay, so you haven't had a postponement before to get a -- an attorney or representative? Okay. So if you want a brief adjournment, a brief postponement today, I'll let you try to get an attorney or representative to come back with you another day. If you want to go forward today, you'll be representing yourself, so you have to be able to cross-examine the Vocational Expert who's here who's going to testify. Do you understand?

OBS[1]:   Your Honor?

ALJ:      Yes?

OBS:      I'm his mother. Can I do it? Because he won't be able to.

ALJ:      No, you can't do it.

---
[1] "OBS" is probably "observer," *i.e.*, plaintiff's mother.

OBS:      Oh, okay.

ALJ:      You can have a minute to talk to him outside.

CLMT:     I don't want to.  I don't want to do it.  I want to wait for -- I want to
          wait for an attorney.

ALJ:      You want to wait for an attorney?

CLMT:     I'll wait for attorney.

ALJ:      Okay.  That's your right.  We'll give you a list of agencies that --

OBS:      Did you want to talk to --

ALJ:      Sir -- ma'am?

OBS:      Huh?

ALJ:      You cannot speak.

CLMT:     Listen, with respect, Judge, that's my moms.

ALJ:      Sir?

CLMT:     Hey.

ALJ:      Sir, be quiet.  Be quiet.

CLMT:     What?

ALJ:      Yeah, be quiet.

CLMT:     That's my moms.

ALJ:      Yeah, I'm aware, and I can --

OBS:      [INAUDIBLE]

ALJ:      -- ask you mother --

OBS:      Yeah.

CLMT:     -- All right.  If it's like that --

ALJ:      Be quiet.

CLMT:     -- why you want -- no!

ALJ:      Ma'am, quiet.  We'll give you a piece of paper that has a list of agencies --

CLMT:     I don't want no paper.

ALJ:      You want to get an attorney or representative on your own?

CLMT:     Yeah.

ALJ:      Okay.  If you get an attorney or representative, have them contact me immediately, so I can --

CLMT:     All right.

ALJ:      -- put this case back on the calendar as soon as possible.

CLMT:     Soon as I get my --

ALJ:      If I don't --

CLMT:     -- date assigned?

ALJ:      Let me finish.  If after -- I do not hear from an attorney or representative after a month or so, your case will be put on the calendar.

CLMT:     So --

ALJ:      And then, when you come back, you will have your hearing whether or not you have an attorney or representative, okay?  In other words, if you get an attorney or a representative -- it doesn't have to be an attorney.  It could be a non-attorney representative.  Have them contact my office immediately, so that I can put this case back on the calendar, and you can come back --

CLMT:     All right.

ALJ:      -- as quickly as possible.

CLMT:     All right, we're going to make it more easier.  How about you just go get me a calendar, huh?

ALJ:      I'm sorry?

CLMT:     How about you go get me one?

ALJ:      Sir, that's not my job.

CLMT:     That's not your job?

ALJ:     No, it's not.

CLMT:    So --

ALJ:     So if you want --

CLMT:    -- how do I supposed to get one?

ALJ:     I'm sorry?

CLMT:    How do I supposed to go get one?

ALJ:     Well, that's why I told you that I have a list of agencies or representative --

CLMT:    Yes.  Can I please get the list?

ALJ:     We'll be giving you the list, sir.

CLMT:    All right, thank you.

ALJ:     Okay.  You're welcome.

CLMT:    All right.

ALJ:     Okay.  Hearing is over.  Leave the record on, please.

CLMT:    All right, thank you.

ALJ:     You're welcome.

HR:      If you'll wait outside, I'll give you the form, okay?

OBS:     Thank you, Judge.

CLMT:    Listen --

ALJ:     Thank you.  Have a seat --

CLMT:    -- Judge --

ALJ:     -- outside.  No more --

CLMT:    I'm in a rush.

ALJ:     -- sir.

OBS:     Come.

CLMT:    I got to go pick somebody up.

OBS:      Come.  Go --

ALJ:      Go outside --

OBS:      Go outside.

ALJ:      -- right now.

CLMT:     This is wrong.  Don't do that.

OBS:      [INAUDIBLE], go outside.  She said that's it.

CLMT:     But we don't have no calendar.

ALJ:      Step out.

HR[2]:    We'll bring --

OBS:      She said that's it.

HR:       -- your form outside.

CLMT:     Yeah, I'll do that.  I will step out.

OBS:      He's going to bring you the form.  That's it.

HR:       I'll bring it to you outside.

CLMT:     Okay.  Bring it then.

OBS:      Your Honor?

HR:       Okay?

CLMT:     Yeah, I'll do it.

OBS:      Thank you so much.  I'm sorry.

ALJ:      Thank you, ma'am.  Step out.

As is apparent, the ALJ effectively was compelled to expel plaintiff from the hearing room, over

his mother's apology for plaintiff's conduct.  Plaintiff had no clue how to behave or control

himself in front of the ALJ.

---

[2] I assume "HR" is "Hearing Reporter."

6.     The second attempt at a hearing, six months later in January 2016, was very brief because plaintiff still had not found a representative.  The ALJ asked plaintiff if he had tried to get an attorney:

ALJ:      And what happened?

CLMT:   I didn't receive –

ALJ:      I'm sorry?

CLMT:   There wasn't -- I didn't receive.  There wasn't enough attorneys.

ALJ:      They didn't receive?

CLMT:   Yes.  It wasn't --

ALJ:      What does that mean?

CLMT:   -- enough attorneys.

The ALJ rescheduled the hearing.  The communication problem is again apparent.

7.     The third attempt at a hearing (in March 2016, this time before a different ALJ) was very similar to the first except that plaintiff mostly argued with his mother, rather than the ALJ. Plaintiff had apparently obtained representation from Queens Legal Services, but for unexplained reasons, the representative withdrew before the hearing.  Through no fault of plaintiff's, the hearing started two hours late, which, according to plaintiff, meant that he was in danger of missing an appointment with his parole officer.  This put plaintiff in an agitated state.  He said to the ALJ:  "I had a 9:30 appointment [for the hearing].  I been -- that's -- I came down here, 9:30, and then, boom.  What happened?  I don't know.  11:00, damn near 12:00, haven't seen a judge, phone dead.  Damn."  (He stated that his phone had died in response to the ALJ's question as to whether he had called his probation officer.)

8.      When the ALJ told plaintiff that he would grant another adjournment so that plaintiff could again try to get a representative, plaintiff responded:

> I wanted to ask you, I don't mind getting another lawyer, right? But one thing. I'm not going to lie to you. And I'm going to guarantee. I'm going to make you a promise about this. I'm not going back to Jamaica Queens to go look for no lawyer.

When the ALJ attempted to explain that plaintiff could get a representative in Brooklyn, and didn't have to go to Queens, plaintiff became even more agitated (this is apparent even from the transcript), castigating his mother and the ALJ for having made him (in his view) go to Queens previously and unnecessarily.

9.      The ALJ presented plaintiff with a form to sign so that the hearing could be rescheduled, to which plaintiff replied, "What the hell is all this . . . . There's too many letters." The record shows what plaintiff meant – he reads, at most, at a third-grade level. He thus had considerable difficulty signing and dating the form agreeing to the adjournment; the hearing reporter had to show him what to do. Plaintiff's mother asked plaintiff if he was ok, to which he responded, "No, I'm not okay. I been here since 9:00." As he continued to argue with his mother, the ALJ again had to ask plaintiff and his mother to "please continue this . . . discussion outside." Plaintiff's mother told her 22-year old son, "Tell him thank you." And plaintiff did.

10.     Plaintiff's behavioral problems continued at the fourth and final attempt at a hearing in June 2016. Although plaintiff had paralegal representation from Queens Legal Services, he refused to enter the hearing room, apparently again upset that they were getting off to a late start, which, he claimed, caused a conflict with a probation or parole hearing. After causing some kind of disturbance, he left the building. The ALJ noted at the outset that

[t]he claimant was present in the waiting room about an hour ago, when I was in the middle of a different hearing. I was notified by one of the supervisors of the office [that] the claimant was causing something of a commotion outside, so I brought the claimant's representative into the room.

11.     Speaking to the paralegal, the ALJ obtained a waiver of plaintiff's presence on the ground that plaintiff was "nonessential." The paralegal gave a brief opening statement; the ALJ examined plaintiff's mother. When the ALJ asked plaintiff's mother if plaintiff really had a conflicting parole hearing, she responded:

To be honest with you, I really don't know. He said he went to his PO yesterday, and then he called me on the phone, and he told me. He said, you [referring to plaintiff's mother], because of you I'm in trouble. They going to lock me up.

. . .

I'm trying to explain to him, no, it's not because of me, it's because of you and your temper. You always want to argue with people and not listen. When people tell you something, you just want to argue and catch fits and, you know, so on. The last time we was here, you know, they had to attain [*sic*] him out there, because he caught one of his fits out there, wanting to throw chairs, he wanting to do this, he wanting to that. So, the only way the security guard can get him quiet, remember? They let him charge is phone out there . . . . Which is no phone allow[ed] out there, but they made an exception for him.

After plaintiff's mother testified, the ALJ proceeded to examine a vocational expert, and then, finally, closed the record.

12.     The ALJ's finding that plaintiff was "nonessential" may have been a reference to the version of Administration's Hearings, Appeals, and Litigation Law Manual (HALLEX) I-2-425(D), which may have been in effect at the time of the fourth hearing, that mandated that if a claimant appeared only through a representative at a hearing, the ALJ could proceed with the hearing if the witness "is not considered to be an essential witness." See McNat v. Apfel, 201

F.3d 1084, 1088 (9th Cir. 2000) (quoting HALLEX).[3]  The ALJ did not articulate a basis for the finding that plaintiff was non-essential, and I do not believe there is one.  A substantial if not the most substantial part of the ALJ's decision considered what plaintiff is and is not able to do, and the ALJ culled selectively from the record observations about activities of daily living, as to which the record conflicts.

13.    Testimony from the claimant seems particularly important in a case involving these kinds of mental limitations because communication difficulties may be part of the impairment: the ALJ must determine if the claimant would be able to communicate at all in the workplace. Indeed, if so much can be learned from the few minutes that plaintiff was present at (or absent from) the attempted hearings, it seems clear much more could be gleaned if the ALJ had insisted on his appearance.  Or perhaps the ALJ might have been compelled to conclude that plaintiff is mentally unable to sit through a hearing and answer basic questions – which would have obvious ramifications for the ultimate determination of his functional capacity.

14.    If the ALJ had found that plaintiff's behavior was a tactic to make it appear that his impairment is more severe than it actually is, that would be within the ALJ's prerogative, at least as an initial matter.  The ALJ has the ability to observe the demeanor of witnesses and determine their motivation based on those observations, something a reviewing court cannot do.  But the ALJ made no such finding, and it would be giving an awful lot of credit for cleverness to a claimant with plaintiff's documented history of attention and communication problems to find that he was consciously trying to manipulate the result.  In the absence of such a finding, my

---

[3] It is unclear whether this provision was in effect at the time of plaintiff's hearing, but it is no longer.  See HALLEX I-2-4-25 at https://www.ssa.gov/OP_Home/hallex/I-02/I-2-4-25.html (last update 5/1/17).

view of the transcripts is that plaintiff simply cannot control himself, even in a situation where submission to authority is critical to his own interest.

15.    This is not to say that any testimony obtained from plaintiff must or should be taken at face value; indeed, the ALJ's selection of certain historical statements by plaintiff about his abilities may not have sufficiently considered plaintiff's credibility in making those statements.  The hearing transcripts and various points in the record suggest that plaintiff may have been minimizing the degree of his impairment or simply failing to appreciate its nature when he made those statements.  A good example of this challenge is reflected in the finding of the ALJ and indeed most of the health care professionals that plaintiff is only mildly impaired in his activities of daily living based largely on what he said to the consultants.  But his mother – who the ALJ expressly found to be a credible witness – testified that plaintiff "would not even take care of his basic personal needs" unless she "stayed on top of him."  "Neal will not brush his own teeth, or even his tongue, unless I stay right there, in the bathroom with him.  Neal will not take a shower unless I don't keep scolding him, Neal, take a shower, take a shower, take a shower, take a shower."  But because the ALJ did not hear testimony from plaintiff on his limitations, he could not have passed on plaintiff's credibility.

16.    One of the accurate observations that the ALJ made is that objective evidence from plaintiff's post-18-year-old treating record is "sparse."  That is true, but the reason is probative of plaintiff's functional capacity.  The management of plaintiff's severe impairments as a minor was handled almost exclusively as part of his schooling.  Despite his virtual illiteracy, he was expelled from school at age 18 (in 2012) for fighting and because of his inability to follow directions.  Despite his repeated homicidal ideation against individuals with whom he becomes angry, he received little treatment after his expulsion, only seeing a social worker on an irregular

basis (as discussed below). (Plaintiff's mother testified that he went every week, but the record suggests that it may sometimes have been every month, and whether weekly or monthly, plaintiff missed a number of appointments.)

17. There is nothing unusual or surprising about this. Plaintiff had been in special education since he was four years old and when that support system was withdrawn at age 18, his family did not have the resources to know where to go. As his mother testified, they live in "the projects," so plaintiff was hardly going to transition from special education services at a public school to a Park Avenue psychiatrist. No one seems to have given any consideration to the possibility of vocational training or remedial services.

18. The conclusions to be drawn from the hearing transcripts are consistent with the later part of plaintiff's school record. (As the ALJ recognized, SSR 11-2p permits consideration of school records for young adults like plaintiff.) Plaintiff was classified as emotionally disturbed. He failed every state examination prior to expulsion and could only acquire just over two credits, neither of which is surprising considering that he is almost illiterate. Despite his mother's testimony to the ALJ that plaintiff's frequently self-professed gang membership was braggadocio, the school found that he had engaged in gang-related behavior, bullying, and threats of violence. He needed more time than his peers to complete tasks, he became easily distracted, and he could do schoolwork only away from others. He needed to be spoken to in simple terms and given frequent breaks. He needed an environment that could provide him "constant support and attention."

19. The ALJ viewed these records from a different perspective, culling from them what seem to me to be largely immaterial mitigating observations (for example, "However, the claimant did acknowledge that his behavior was inappropriate."). I do not see how any

conclusion can be drawn from the school records other than that plaintiff is a deeply disturbed, out-of-control individual.

20.     I am not seeing much different from the minimal therapy plaintiff received after his expulsion. The ALJ relied (in part) on an intake evaluation for outpatient services by a psychiatrist, Dr. Jean Jacques, in 2012, at HeartShare St. Vincent's Services, which is largely illegible. It is followed by a more legible but mostly incomplete submission from someone else at HeartShare (it is written in a different hand than Dr. Jacques's), which is unsigned. I agree with the ALJ that both of these documents, to the extent information can be gleaned from them, appear to show less impairment than plaintiff's school records, but they are hard to weigh considering the illegibility, incompleteness, and provenance issues. Beyond that, they suffer from the same limitations as any single-visit, snapshot evaluation. On the key points of this inquiry – impulse control and intelligence – Dr. Jacques's notations are not fully legible, but state for the former "good during [illegible]" and "poor by [illegible], and "borderline to low [illegible]" for the latter. In addition, part of Dr. Jacques's observation of "no homicidal ideation," is contradicted throughout the record.

21.     Once again, the ALJ extracted from Dr. Jacques's notes those mitigating observations that are almost entirely immaterial to the key questions about plaintiff that I have identified. The ALJ observed, for example, the notes stating that plaintiff was groomed, had no memory impairment, and good eye contact. But those things are not plaintiff's main problem. He may remember very well the severe consequences of his socially unacceptable behavior because his memory is unimpaired, but the rest of the record suggests that he either doesn't care or is not able to use that knowledge to control his behavior on future occasions.

22.     More probative is Dr. Jacques's observation, cited by the ALJ, that plaintiff was cooperative during the interview.  But no one has attempted to reconcile the brief periods of self-control that plaintiff sometimes displays when talking with therapists to the out-of-control behavior he seems to demonstrate towards everyone else, and what that comparison yields in terms of workplace functionality.

23.     One point that is legible from that part of the document signed by Dr. Jacques is his recommendation that plaintiff receive individual psychotherapy and anger management. Plaintiff's assigned therapist at St. Vincent was Mr. Stuart Knibb, a Licensed Master Social Worker.  Because an LMSW is not permitted to administer psychotherapy without supervision in New York,[4] Mr. Knibb's evaluation is not entitled to the deference of the treating physician rule. See 20 C.F.R. §§ 404.913(a), 20 C.F.R. § 416.927(a)(2); see SSR 06-03p, 2006 WL 2329939, at *1-6 (2006) ("Medical sources who are not 'acceptable medical sources,' [include] nurse practitioners, physician assistants, licensed clinical social workers, . . . and therapists.").

24.     But that does not mean his opinion should be rejected out of hand – it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."  SSR 06-03p, 2006 WL 2329939, at *5.  Mr. Knibb had the only post-school relationship with plaintiff consisting of more than one session – Mr. Knibb reported monthly sessions with plaintiff over a

---

[4] In New York, a Licensed Master Social Worker is not permitted to administer psychotherapy except under the supervision of a Licensed Clinical Social Worker, psychologist, or psychiatrist.  See LMSW License Requirements, Office of the Professions, N.Y. State Ed. Dep't, http://www.op.nysed.gov/prof/sw/lmsw.htm (last updated Dec. 27, 2017).

twelve-month period through the date of plaintiff's final hearing, and bi-weekly after that for another year.

25.    Mr. Knibb actually rendered two functional assessments, a "Psychiatric Report" (Report I) in June 2016 just before plaintiff's fourth hearing, which the ALJ took into account, and a "Psychiatric Residual Functional Capacity Report" (Report II), completed in May 2017, which was delivered to the Appeals Council by Queens Legal Services on behalf of plaintiff after the ALJ decided that plaintiff was not disabled.  Although the two reports are in many ways substantially similar, there are a few points in Report II suggests that plaintiff's condition worsened over the year between them.  Report I stated, in part:

> 22 year old A[frican] A[merican] male mood depressed and angry about his family situation.  Speech clear and not pressured.  Thought process is illogical, thought content is angry not delusional but states that his gang members have things against him.  Mild cognitive impairment.  Insight and judgment is impaired due to lack of conscience regarding hurting others.

When asked to evaluate plaintiff's condition in maintaining social functioning, Mr. Knibb checked "EXTREME" on a five-level scale of "NONE" to "EXTREME," and commented that "patient continues to have issues with impulse control and anger management.  Plaintiff reports a fight at least two weeks ago."  He also noted that plaintiff has "poor insight into his illness."

26.    The ALJ gave Report I only "some weight," again emphasizing those points that in my view were not central to which of plaintiff's impairments compromised his RFC, like "he has not been treated in the emergency room for a mental disorder" and he "has not lived in a community residence or other highly supportive living situation" (which I assume does not include prison, where plaintiff spent approximately four months in the fall of 2012).  The ALJ also discounted Report I because Mr. Knibb's treatment of plaintiff was "sporadic."  This does not make much sense to me, since however sporadic the sessions, Mr. Knibb had much more

16

exposure to plaintiff than did Dr. Jacques (who saw plaintiff only one time), the consulting

psychologist (who also saw plaintiff only one time), or the consulting psychiatrist (who never

saw plaintiff at all) – and the ALJ gave the opinions of the last two doctors "great weight."

(These two evaluations are discussed further below.)

27.     The response on Report I which the ALJ most emphasized was to the question,

"Does the patient have the ability to make occupational adjustments? ([*i.e.*,] to understand, carry

out and remember instructions, to respond appropriately to a supervisor and coworkers, to handle

customary pressures in a private work setting)."  Mr. Knibb checked "yes."  However, dollars to

donuts he made a mistake, that is, Mr. Knibb gave an answer he didn't mean to give.  The notion

that plaintiff could respond appropriately to supervisors and co-workers, and handle pressures in

a work setting, is contrary to the "EXTREME" limitation in social functioning that Mr. Knibb

had checked earlier on the same form, the question for which included a descriptor, "Social

functioning refers to the capacity to interact appropriately and communicate effectively with

other individuals."  The two answers cannot be reconciled.

28.     Mr. Knibb's answer to this "occupational adjustments" question in Report I is also

inconsistent with his answers in Report II, prepared about one year later (which could also

suggest that plaintiff's condition worsened).  As to "Social functioning," including the same

descriptor as Report I, Mr. Gibbs checked the highest impairment classification, which on this

questionnaire was "marked" (only four levels were offered).  He again commented, "poor

impulse control.  Frequent verbal altercations with parent.  Frequent physical altercations with

others in the community."

29.     Other notations in Report II are also significant.  As to "Concentration, persistence,

and pace," Mr. Knibb checked "moderate" impairment (third most severe out of four), and

commented that "client demonstrates an inability to stay on task during sessions." This is significantly worse than his assessment for the same criteria in Report I, in which Mr. Knibb checked "mild" impairment (second least severe out of five). As to the question whether plaintiff's "psychiatric impairments caused him to experience or be expected to cause him to experience deterioration or decompensation in a work or work-like setting," Mr. Knibb checked "yes" out of the "yes" or "no" options. He again noted plaintiff's "poor impulse control" and "inability to work with others for periods of time."

30. The questionnaire also contained a number of specific workplace inquires including these:

- Remember locations and worklike procedures
- Understand and remember very short and simple instructions
- Carry out very short and simple instructions
- Maintain concentration and attention for extended periods
- Perform activities within a schedule
- Maintain regular attendance
- Be punctual within customary tolerances
- Sustain ordinary routine without special supervision
- Work in coordination with or proximity to others without being unduly distracted by them
- Complete normal workday and workweek without interruptions from psychologically based symptoms
- Perform at a consistent pace without an unreasonable number and length of rest periods
- Make simple work-related decisions
- Accept instructions and respond appropriately to criticism from supervisors
- Get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes
- Interact appropriately with the public

– Respond appropriately to changes in a routine work setting

For each of these, Mr. Knibb checked that plaintiff "cannot satisfy this requirement on a full-time, 40 hour week, basis – experiences substantial loss of effective function in this area." These conclusions were based on plaintiff's "poor impulse control" and "h[istory] of aggression" that "precludes client working with others for a 40 hour work week" and "borderline intellectual functioning." Mr. Knibb also commented that plaintiff "needs substantial supervision from parent. Patient is routinely hostile towards redirection and directives."

31.    A fair reading of Mr. Knibb's assessment in Report II, which is far more detailed than Report I, is that plaintiff's behavioral problems are so extreme that they would permeate virtually every aspect of his performance in the workplace. Of course, I cannot fault the ALJ for failing to consider this post-decision report. But since Mr. Knibb's second report and plaintiff's conduct at the four hearings would have to be considered on remand, they are relevant to my decision on review.

32.    Most importantly, Report II is fully consistent with the unavoidable conclusions that must be drawn from the four hearing transcripts. Those transcripts, had the ALJ considered them, could have provided an unusually deep view of the record from the ALJ's first-hand perspective.

33.    Finally, there is not substantial evidence to support the "great weight" that the ALJ afforded the opinions of the consulting examiner-psychologist, Dr. Toula Georgiou, and consulting psychiatrist, Dr. P. Kennedy-Walsh, for two reasons. First, those consulting doctors did not have the benefit of what appears to be the most probative original evidence in this record – the hearing transcripts, the later school records, and Mr. Knibb's two reports (again, at least to the second of Mr. Knibb's reports, the ALJ cannot be faulted for this). Second, the risk of error

in relying on consultants who examine a claimant only once – in Dr. Kennedy-Walsh's case, not even once – is well established.  See Minsky v. Apfel, 65 F. Supp. 2d 124, 128 (2d Cir. 1999) ("The general rule is that 'the written reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability" (quoting Vargas v. Sullivan, 898 F.2d 293, 295 (2d Cir. 1990) (collecting cases))).

34.    Those risks, it seems to me, are greatly heightened when the impairments under consideration are mental or psychological.  The definition of disability does not require a constant state of decompensation, and it would be unusual if a mentally or emotionally disturbed person did not have many short periods in which they appear relatively undisturbed.

35.    In determining whether to remand for another hearing or simply an award of benefits, I recognize that the record has to be extremely one-sided to support the latter form of relief.  However, I see no way that the record that this record could support a finding of non-disability.  Plaintiff has so little functional capacity he cannot even get through a hearing being held for his benefit, let alone perform a job. Although Mr. Knibb's opinion in both his first and second reports is not entitled to deference under the treating physician rule, he had the benefit of seeing plaintiff over many sessions for at least two years.  His opinion supported a finding of marked limitations in plaintiff's ability both to interact with others and to manage himself.  His opinion also supported a finding of an extreme limitation in plaintiff's ability to interact with others.  Thats opinion was amply supported by plaintiff's school records, particularly the later ones, the testimony of his mother, and by his interactions with the two ALJs over four hearings. The contrary opinions of Drs. Georgiou and Kennedy-Walsh, by comparison, were based on a single examination of plaintiff and no examination at all, respectively, and without the benefit most probative record evidence.

36.     Of course, the award of benefits here is not going to address the deep emotional and behavioral problems that plaintiff has.  He is strongly anti-social and no one seems to be getting him the therapy and training that might point him in another direction.  But there is nothing we can do about that in the context of this proceeding.  All we can do is determine whether he has sufficient RFC to perform any kind of regular employment.  Even granting the ALJ's restrictions, I think this record is overwhelming that he meets the standard for disability.

37.     Defendant's motion for judgment on the pleadings [11] is DENIED.  The case is remanded for the determination of benefits only from the onset date of June 6, 2012.  The Clerk is directed to enter judgment accordingly.

**SO ORDERED.**


_____
                                                    U.S.D.J.

Dated: Brooklyn, New York
          August 31, 2018